**Nos. 26-4098, 26-4099**

# In the United States Court of Appeals for the Fourth Circuit

**UNITED STATES OF AMERICA,**
**Plaintiff-Appellant,**

**v.**

**KAZEM KAZEMPOUR,**
**Defendant-Appellee.**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND, D. CT. NO. 8:22-CR-440 (HON. PAULA XINIS)

## PAGE-PROOF OPENING BRIEF FOR THE UNITED STATES

KELLY O. HAYES
*United States Attorney*

DAVID C. BORNSTEIN
*Chief, Appellate Division*
*District of Maryland*

JEREMY R. SANDERS
*Appellate Counsel*

MATTHEW REILLY
VASANTH R. SRIDHARAN
*Trial Attorneys*
*Fraud Section*

A. TYSEN DUVA
*Assistant Attorney General*

JOSH A. GOLDFOOT
*Deputy Assistant Attorney General*

WILLIAM G. CLAYMAN
*Attorney, Appellate Section*
*Criminal Division*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C. 20530*
*(202) 514-0040*
*William.Clayman@usdoj.gov*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 2

STATEMENT OF THE ISSUE ........ 2

STATEMENT OF THE CASE ........ 2

I. Statement of Facts ........ 3

A. Pourhassan Hires Kazempour to Apply for Government Approval to Market an Experimental HIV Drug. ........ 3

B. Kazempour Does Not File the Application by the Deadline That Pourhassan Announced to Investors. ........ 7

C. Kazempour Files an Incomplete Application and Then Seeks to Sell Shares of CytoDyn Stock. ........ 9

D. The FDA Rejects Kazempour's Incomplete Application. ........ 11

II. Procedural History ........ 13

A. Kazempour's Charges ........ 13

B. Kazempour's Pretrial Proceedings ........ 15

C. Kazempour's Trial ........ 17

D. Kazempour's Post-Trial Motions ........ 23

III. Ruling Under Review ........ 24

SUMMARY OF ARGUMENT ........ 24

ARGUMENT .......... 25

The District Court Erred In Granting a New Trial .......... 25

A. Standard of Review .......... 25

B. The Jury's Verdict Was Not Tainted by Impermissible Spillover Evidence. .......... 27

C. The District Court Abused Its Discretion by Disregarding the Core Tenet that Juries Follow Instructions. .......... 38

D. At a Minimum, This Court Should Reverse the District Court's Grant of a New Trial on the Wire-Fraud Count. .......... 45

CONCLUSION .......... 49

STATEMENT REGARDING ORAL ARGUMENT .......... 50

CERTIFICATE OF COMPLIANCE .......... 51

CERTIFICATE OF SERVICE .......... 52

## TABLE OF AUTHORITIES

**Cases**

*CSX Transp., Inc. v. Hensley*,
556 U.S. 838 (2009) .......... 40

*Francis v. Franklin*,
471 U.S. 307 (1985) .......... 33, 39

*Opper v. United States*,
348 U.S. 84 (1954) .......... 33, 37, 41

*Pennsylvania Co. v. Roy*,
102 U.S. 451 (1880) .......... 40

*Richardson v. Marsh*,
481 U.S. 200 (1987) .......... 40

*Samia v. United States*,
599 U.S. 635 (2023) .......... 39, 40

*United States v. Akinkoye*,
185 F.3d 192 (4th Cir. 1999) .......... 31

*United States v. Banks*,
104 F.4th 496 (4th Cir. 2024) .......... 27

*United States v. Bullock*,
203 F.3d 823 (Tbl.), 2000 WL 84449 (4th Cir. Jan. 27, 2000) .......... 34

*United States v. Campbell*,
963 F.3d 309 (4th Cir. 2020) .......... 27, 28, 29

*United States v. Cole*,
857 F.2d 971 (4th Cir. 1988) .......... 29

*United States v. Correia*,
55 F.4th 12 (1st Cir. 2022) .......... 26, 28

*United States v. Covington*,
--- F.4th ---, 2026 WL 1902549 (4th Cir. July 2, 2026)........... 27, 31, 34

*United States v. Devine*,
40 F.4th 139 (4th Cir. 2022) ........................................................ 29, 34

*United States v. Dinkins*,
691 F.3d 358 (4th Cir. 2012)............................................................. 30

*United States v. Fulton*,
136 F.4th 185 (4th Cir. 2025) ...................................................... 26, 47

*United States v. Hall*,
93 F.3d 126 (4th Cir. 1996), *abrogated on other grounds by Richardson v. United States*, 526 U.S. 813 (1999) ............................. 30

*United States v. Hart*,
91 F.4th 732 (4th Cir. 2024) ............................................................ 27

*United States v. Head*,
77 F.3d 472 (Tbl.), 1996 WL 60445 (4th Cir. Feb. 12, 1996).............. 26

*United States v. Hill*,
643 F.3d 807 (11th Cir. 2011)........................................................... 35

*United States v. Janati*,
374 F.3d 263 (4th Cir. 2004)............................................................. 30

*United States v. Lester*,
816 F. App'x 780 (4th Cir. 2020)........................................................ 34

*United States v. Millender*,
970 F.3d 523 (4th Cir. 2020).................................................. 38, 47, 48

*United States v. Olano*,
507 U.S. 725 (1993)........................................................................... 33

*United States v. Oloyede*,
933 F.3d 302 (4th Cir. 2019)............................................................. 37

*United States v. Rafiekian*,
991 F.3d 529 (4th Cir. 2021) .......... 26, 39, 40, 41

**Statutes and Rules**

15 U.S.C. § 78ff .......... 2, 14

15 U.S.C. § 78j .......... 2, 14

18 U.S.C. § 2 .......... 2

18 U.S.C. § 371 .......... 2

18 U.S.C. § 1001 .......... 2

18 U.S.C. § 1343 .......... 2

18 U.S.C. § 3231 .......... 2

18 U.S.C. § 3731 .......... 2

28 U.S.C. § 1291 .......... 2

17 C.F.R. § 240.10b-5 .......... 2, 14

Fed. R. App. P. 4 .......... 2

Fed. R. Crim. P. 33 .......... 25

## INTRODUCTION

Defendant-appellee Kazem Kazempour and co-defendant Nader Pourhassan were charged with various crimes in connection with a scheme to defraud the shareholders of Pourhassan's company. After a weeks-long trial, the court admonished the jury to consider each count and each defendant separately and not to let its verdict on any count influence its verdict on any other count. Despite this clear guidance, the court granted Kazempour a new trial on the assumption that spillover evidence of Pourhassan's insider-trading charges confused the jury.

That was an abuse of discretion. There was no risk of spillover prejudice: the charges against the defendants were premised on similar evidence; the evidence supporting Kazempour's convictions was strong; the jury received clear instructions on the charges and how to weigh the evidence; and the jury's split verdicts confirm that they took those instructions seriously and assessed the defendants separately. The court overlooked these factors and granted Kazempour a new trial based on unfounded speculation that the jurors disregarded the jury instructions. In so doing, the court gave insufficient deference to the bedrock presumption that a jury will follow its instructions. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court (Xinis, J.) had jurisdiction under 18 U.S.C. § 3231 and granted Kazempour a new trial on January 16, 2026. DE.374. The United States filed a timely notice of appeal on February 13, 2026. DE.392; *see also* Fed. R. App. P. 4(b)(1)(B). This Court has jurisdiction under 18 U.S.C. § 3731 and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court erred by granting Kazempour a new trial based on the asserted effects of prejudicial spillover from his co-defendant's insider-trading charges.

## STATEMENT OF THE CASE

A grand jury charged Kazempour with conspiring to commit securities fraud and wire fraud (Count 1), in violation of 18 U.S.C. § 371; securities fraud and aiding and abetting securities fraud (Counts 2, 3, 4, and 5), in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; wire fraud (Counts 8 and 9), in violation of 18 U.S.C. § 1343; and making false statements to law enforcement (Count 14), in violation of 18 U.S.C. § 1001(a)(2). DE.185. Following a three-week trial, a jury found Kazempour guilty of securities fraud, as charged in Count 3, and wire fraud, as charged in Count 8, and not guilty on the remaining

counts. DE.282. Before sentencing, the district court vacated Kazempour's convictions and granted him a new trial. DE.375.

## I. Statement of Facts

This case involves a scheme to defraud investors in Pourhassan's company, CytoDyn. As explained below, Pourhassan hired Kazempour's research company, Amarex, to help CytoDyn apply for government approval to market an experimental drug as a treatment for HIV. After Kazempour failed to meet the application deadline that Pourhassan publicly announced to shareholders, Pourhassan told Kazempour that his company's stock price plummeted and ordered Kazempour to file the application even if it was unfinished. Kazempour then filed an incomplete application and tried to sell his CytoDyn stock after Pourhassan told investors that Kazempour had submitted a complete application. A jury found Kazempour guilty of aiding and abetting securities fraud and committing wire fraud.

### A. Pourhassan Hires Kazempour to Apply for Government Approval to Market an Experimental HIV Drug.

This case revolves around two defendants: Kazempour, the CEO of a Maryland-based contract research company called Amarex Clinical Research; and Pourhassan, the CEO of CytoDyn Inc., a small, publicly

traded biotechnology company that hired Amarex. DE.185:1-2. In around 2011, CytoDyn acquired the rights to an experimental drug called leronlimab and spent the next decade trying to obtain approval from the Food and Drug Administration (FDA) to license the drug as a treatment for HIV and, later, COVID-19. DE.287:232-36, 265-66; DE.288:205.

To obtain FDA approval, CytoDyn had to prepare a biologics license application (BLA). DE.286:180-85. A complete BLA has "three major components": (1) a "chemistry, manufacturing, and control" module, which describes how the drug will be safely manufactured for large-scale distribution; (2) a nonclinical module, which describes the results of laboratory and preclinical testing of the drug; and (3) a clinical module, which describes the results of multi-phased human clinical trials and confirms that the drug is safe and effective. DE.290:203; DE.286:183-84. Preparing a BLA is, in other words, "a big deal" that takes years—if not decades—of work. DE.287:76, 235; DE.295:63. And once a company submits a BLA for review, the FDA has 60 days to determine whether it is complete. DE.286:185. If the FDA determines that it is, a multi-disciplinary team begins a months-long review to determine whether to approve or reject the application. DE.286:186. But if the BLA is lacking in some

respect, the FDA will decline to formally review the BLA through a "refuse-to-file letter" that outlines "what the deficiencies are and what information is needed to resolve those deficiencies." DE.286:185-86.

CytoDyn was a single-drug, pre-revenue company, meaning that it focused exclusively on developing leronlimab for commercial distribution and relied on selling warrants and stock options to generate revenue.[1] DE.286:96-97; DE.288:25. The successful submission of a BLA for leronlimab was therefore "[c]entral to [CytoDyn's] existence." DE.292:39. Receiving a refuse-to-file letter, on the other hand, would be "a big setback" to CytoDyn's financial viability. DE.290:221; DE.292:129.

Given its small size, CytoDyn lacked the infrastructure needed to complete a BLA. DE.295:35; DE.288:41. Accordingly, Pourhassan hired Amarex to conduct the clinical trials of leronlimab, prepare the BLA, and communicate with the FDA on CytoDyn's behalf. DE.288:41; DE.286:181; DE.292:28-29. The financial success of the companies be-

[1] Warrants and options are securities that provide the holder with a right to purchase a company's stock "at a set price within a set period of time." DE.286:90-91. Stock options are typically "given by the company to employees," while warrants are typically issued by a company to outside investors and consultants. DE.286:91, 127.

came intertwined as a result: CytoDyn was "100 percent reliant" on Amarex and was also Amarex's largest customer. DE.292:29; DE.288:255. As Amarex's CEO, Kazempour worked closely with CytoDyn and acted as its regulatory agent and primary liaison with the FDA.[2] DE.287:240-41. Kazempour and Pourhassan were therefore "in constant communication" about the BLA. DE.292:62-63.

Kazempour was also a member of CytoDyn's disclosure committee, a group of "subject matter experts" organized by CytoDyn Chief Financial Officer (CFO) Michael Mulholland to ensure that the company's filings with the Securities and Exchange Commission (SEC) provided accurate information to the investing public. DE.292:29-31. Kazempour apprised the committee on "all regulatory matters," including "correspondence with the FDA, developments related to clinical trials," and the "ongoing effort to complete the BLA[.]" DE.292:30-31, 71. In addition to ensuring the accuracy of the regulatory updates in SEC filings, Kazempour also reviewed and signed off on CytoDyn's press releases about the BLA. DE.292:65-66; DE.287:245.

[2] A regulatory agent is a formal intermediary who handles all communications between a pharmaceutical company and the FDA during the BLA process. DE.295:36.

In short, Kazempour was "intimately involved in [CytoDyn's] day-to-day activities." DE.287:263-64. He was also "gracious" when CytoDyn fell "behind" on paying Amarex and sometimes accepted compensation in the form of CytoDyn securities. DE.287:262-63.

### B. Kazempour Does Not File the Application by the Deadline That Pourhassan Announced to Investors.

Given leronlimab's potential to address an "unmet medical need," the FDA allowed Kazempour to make rolling submissions of data for review before he filed the complete BLA. DE.286:183. By 2018, Kazempour's submissions included data from clinical trials, which were "very, very expensive" to conduct. DE.287:238. At this point, CytoDyn was spending "millions of dollars" a month, with most of this money going to Amarex. DE.286:95; DE.287:240; DE.292:39-40.

As Amarex conducted clinical trials, CytoDyn met with the FDA to discuss its anticipated submission of the BLA. Kazempour represented CytoDyn at these meetings and heard that the FDA was skeptical of their proposed timeline for the submission. DE.286:188, 213-20. At a meeting in June 2018, for example, CytoDyn said that it would submit its BLA in the first quarter of 2019; the FDA responded that the clinical data did not show leronlimab's efficacy, that some of the data was unreviewable,

and that this timeline was unreasonable. DE.286:188, 213-20. On a follow-up call, the FDA reiterated that CytoDyn's timeline was "overly optimistic" and cautioned that it could not accept the BLA if these issues persisted. DE.286:223-30; DE.287:23-26; DE.291:29-30.

As CytoDyn "burn[ed]" through money, Pourhassan became "[v]ery focused" on raising revenue. DE.292:45, 129. Accordingly, while Kazempour wrangled with the FDA, Pourhassan began issuing press releases about the BLA to generate investor interest. DE.292:46-47; DE.287:244-45. These statements worried others at CytoDyn, who were concerned that he was "exaggerat[ing]" the company's progress. DE.287:244-46; DE.290:229-30. In November 2018, for example, CytoDyn issued a press release stating that the company was "on track" to submit its BLA in early 2019. DE.286:220-22. In response, the FDA requested a meeting "to talk about the significance of the press release" and outstanding issues with the BLA. DE.286:222. While Kazempour maintained that he would "have all the required information," he did not submit a complete BLA in early 2019. DE.286:232. Instead, he continued to send piecemeal updates, with the FDA repeatedly expressing concerns about the substance and formatting of his submissions. DE.287:30, 50-51, 153.

### C. Kazempour Files an Incomplete Application and Then Seeks to Sell Shares of CytoDyn Stock.

As CytoDyn's publicly advertised filing date came and went, Pourhassan felt pressure from investors. Things reached a boiling point in early 2020, with Pourhassan emailing Kazempour that "everyone [wa]s asking for [his] head" because CytoDyn's "stock price dropped" and its "market cap went down by $200 million."[3] DE.288:218; GX.6. Pourhassan told investors in a video statement that CytoDyn would submit a complete BLA at the end of April, and, on April 14, 2020, he sent an email to Kazempour and two other employees with the subject line "BLA submission." DE.288:225; DE.290:234-36; GX.2. In the body of the email, Pourhassan wrote that CytoDyn had seen an "almost 20 percent drop" in its stock price, that CytoDyn's investors were "very frustrated," and that the stock price would continue to drop if Kazempour did not file the BLA. DE.288:225-26; GX.2. Pourhassan therefore instructed him to file the BLA even if it was "short." DE.288:226. Kazempour later forwarded this email to colleagues and added, "We had discussion[s] with

[3] Market cap refers to a company's value on a stock exchange. DE.286:70.

him and told him all about the issue. He said do it regardless[!]" DE.289:25.

On April 27, Kazempour filed the BLA. DE.287:28-29. In his cover letter, he acknowledged that the submission was still missing clinical data, but he promised to submit more data the following month. DE.287:29-30; DE.290:109-110. Later that day, CytoDyn issued a press release in which Pourhassan announced that the company had filed a "complete" BLA. DE.287:30-31; DE.288:234. He described the filing as a "monumental achievement" that would allow CytoDyn to "transition from a development-stage company to a commercial organization." DE.286:110-12, 175; GX.35:1. Pourhassan also convened an investor call to congratulate Kazempour and affirm that the submission was an important milestone. DE.291:25-28. CytoDyn's investors were "quite excited" by the news. DE.288:109; DE.287:160; DE.290:165.

The next day, Kazempour emailed Mulholland—CytoDyn's CFO—and Pourhassan to ask what he needed to do to sell his "shares" in CytoDyn stock. DE.288:246; DE.292:105-06; GX.138:2. He explained that CytoDyn had given him "150,000 share options" and that, "after this many years," he wanted "to sell the shares now!!" GX.138:2; DE.288:246.

Mulholland replied that Kazempour was referring to warrants that gave him the right to buy 150,000 shares of stock and advised that CytoDyn would file paperwork to allow Kazempour to buy and sell those shares by mid-May.[4] GX.138:1; DE.292:226; DE.294:145.

### D. The FDA Rejects Kazempour's Incomplete Application.

Behind the scenes, Kazempour and Pourhassan had a problem: the FDA had repeatedly told Kazempour that the BLA was incomplete without the missing datasets. DE.287:30. After seeing CytoDyn's press release, an FDA employee emailed Kazempour on April 29 to point out that, contrary to Pourhassan's announcement, the BLA was incomplete. DE.287:32; GX.38. The FDA told Kazempour to communicate the FDA's concerns over this "misinformation" to CytoDyn and retract his filing. DE.287:32.

Over a week later, CytoDyn issued a "clarif[ying]" press release explaining that the BLA was not complete. GX.46; DE.287:227. Kazempour then submitted additional data to the FDA and told the agency that the BLA was now complete, DE.287:36-37, which prompted CytoDyn to

[4] Unlike Kazempour, Pourhassan successfully traded shares in CytoDyn stock shortly after CytoDyn issued this press release, netting millions of dollars in profit. DE.294:140-41.

issue another press release announcing that the BLA was finally done. DE.291:34. Meanwhile, the FDA realized that Kazempour's follow-up submission failed to fix the BLA's deficiencies. DE.287:40-43; DE.294:49-54. These issues presented "a big problem from a safety perspective," because some of the missing data related to whether leronlimab caused moderate, severe, or even fatal side effects. DE.294:51-52. Accordingly, on July 8, 2020, the FDA sent Kazempour a refuse-to-file letter informing him that the BLA had "numerous omissions and inadequacies so severe as to render the application incomplete" and incapable of "meaningful review." DE.287:41; GX.63:2.

CytoDyn employees were "upset" and "shocked" when they learned that the FDA issued a refuse-to-file letter. DE.291:26, 35; DE.292:83-94, 102-03, 128. But both Pourhassan and Kazempour downplayed the problem and assured others that they did not need to do "a great deal of work" before resubmitting the BLA. DE.291:38; DE.292:130. And when it came time for CytoDyn to provide an annual update on its financial outlook to the SEC, CytoDyn relied on information from Kazempour and Pourhassan to represent that the company had submitted a complete BLA in May 2020. DE.292:31-32, 72-73, 131-33.

Kazempour did not fix the problems identified in the refuse-to-file letter. DE.287:51-52; DE.291:38. Instead, CytoDyn pivoted to seeking emergency approval to market leronlimab as a treatment for COVID-19. DE.292:134; DE.289:16-17. The FDA reviewed the results of CytoDyn's clinical trials, however, and advised that they did not reliably establish leronlimab's efficacy in treating COVID-19. DE.293:264-68; DE.294:44-45. After CytoDyn issued a series of press releases suggesting that clinical testing had produced "statistically significant" positive results, the FDA publicly announced that the available data did not support the use of leronlimab to treat COVID-19. DE.287:169-71; DE.294:44-45; DE.289:20.

## II. Procedural History

### A. Kazempour's Charges

A grand jury returned an indictment against Pourhassan and Kazempour in 2022, followed by a 14-count superseding indictment in 2024.[5] DE.1; DE.185. Count 1 of the indictment charged Pourhassan and Kazempour with conspiracy to commit securities fraud and wire

[5] For simplicity, this brief refers to the superseding indictment as "the indictment" going forward.

fraud. DE.185:1-31. Counts 2 through 5 charged them both with securities fraud and aiding and abetting securities fraud. DE.185:32-33. Counts 6, 7, and 10 charged Pourhassan with wire fraud, and Counts 8 and 9 charged Kazempour with the same. DE.185:34-35. Counts 11 through 13 charged Pourhassan with insider trading, in violation of 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b-5. DE.185:36-37. And Count 14 charged Kazempour with making false statements to law enforcement. DE.185:38.

The indictment alleged that Kazempour committed securities fraud under several theories. In Count 1, the indictment alleged that Kazempour conspired with Pourhassan to commit securities fraud by, *inter alia*, employing "a deceptive device" through the filing of the incomplete BLA on April 27, 2020, so that Pourhassan could mislead investors, and by failing to correct the "materially false and misleading representations" in CytoDyn's press releases and SEC filings. DE.185:19-22. Counts 2 through 5, on other hand, alleged that Kazempour both committed securities fraud and aided and abetted Pourhassan's securities fraud. DE.185:32-33. Counts 4 and 5 alleged that Pourhassan and Kazempour

"caused CytoDyn" to submit false information in SEC filings on two specified dates. DE.185:33. And Count 3—one of the counts on which the jury later found Kazempour guilty—alleged that Kazempour aided and abetted Pourhassan's securities fraud when he "filed an incomplete BLA on CytoDyn's behalf with the FDA" on April 27, 2020. DE.185:19, 32-33.

The other count on which the jury later found Kazempour guilty—Count 8—alleged that he committed wire fraud on April 28, 2020, by asking how to sell his shares in CytoDyn stock in an email to CytoDyn's CFO and Pourhassan. DE.185:34-35.

### B. Kazempour's Pretrial Proceedings

Before trial, Kazempour filed a motion to sever his trial from Pourhassan's to avoid "spillover prejudice" caused by Pourhassan's role as the "initiator" of the fraudulent scheme. DE.62-1:9-10. In rejecting this request, the district court observed that severance was not "appropriate." DE.146:4. The court explained that concerns about one defendant being prejudiced by evidence against another "happen[] in 99 percent of conspiracy cases," and that the court had "wide discretion" in crafting instructions to prevent such prejudice from infecting the jury's deliberations. DE.146:4, 14-15.

Kazempour likewise sought to litigate the securities-fraud charges before trial. In particular, he took issue with the allegation in Count 1 that he had a "duty to correct" false information in CytoDyn's public statements. DE.104:13-16. He therefore filed a motion *in limine* asking that the court preclude the government from arguing that he had a "duty to correct" CytoDyn's statements or that he was an "insider" at CytoDyn. DE.104:7. Because he was not charged with insider trading, he reasoned, the government should be precluded from arguing that he was an insider who owed any duty to CytoDyn's shareholders—a legal principle that he considered unique to insider trading. DE.104:13-29.

After holding several hearings and receiving additional briefing and motions on this issue, the court disagreed. As the court explained, Kazempour's role at CytoDyn was generally relevant because it was part of the facts supporting the overarching conspiracy. DE.197:210-11. And while the conspiracy and aiding-and-abetting charges did not hinge on any asserted duty that Kazempour owed to CytoDyn's investors, the court further explained that whether Kazempour had an independent duty to correct was relevant to any government claim that Kazempour himself committed securities fraud by making (or causing others to

make) a false statement of material fact in CytoDyn's press releases or SEC filings. DE.166:162-63, 170-71; DE.197:203-06, 212-17.

### C. Kazempour's Trial

Kazempour and Pourhassan proceeded to trial together in November 2024. DE.284. The government called 14 witnesses, including several of CytoDyn's directors and officers, a securities-industry expert, several FDA employees, an FBI special agent, and four victim-investors. Kazempour called four witnesses, including two Amarex employees who assisted with the BLA. Kazempour's defense was twofold: (1) he relied on an employee to review CytoDyn's press releases; and (2) he believed that the BLA was complete when he submitted it in April 2020. DE.298:229-34.

During its opening statement, the government noted that Kazempour worked with Pourhassan to "conceal critical information" from CytoDyn's CFO and "keep[] up CytoDyn's stock price" because Kazempour was "more like an insider" than a contractor and had "skin in the game." DE.286:19. Then, over the course of the trial, the government elicited a handful of statements from CytoDyn employees about Kazempour's role at CytoDyn. Mulholland, the CFO, testified that Kazempour was "not an

employee" but still played an important role as CytoDyn's "formally appointed agent" with the FDA. DE.292:71. CytoDyn's former executive chair likewise testified that Kazempour held "no formal position" at CytoDyn but was "like one of the staff." DE.287:240-41. And based on this testimony, the government argued in closing that Kazempour was not formally "part" of CytoDyn but was "like [a] part" of the company and had "a financial stake" in it, which explained why he and Pourhassan "did what they did." DE.298:139. In particular, the government noted that he "received warrants and stock options" and argued that his attempt to sell his stock after Pourhassan announced that he filed a complete BLA but before others learned that this was false demonstrated his "intent" to profit from the charged conspiracy. DE.298:136, 149.

At the same time, the parties and the court repeatedly emphasized to the jury that Kazempour was not charged with insider trading. At the outset of trial, the court told the jury that both defendants were charged with securities fraud and wire fraud, but that Pourhassan alone was charged with insider trading. DE.284:25. In its opening statement, the government reiterated that Pourhassan was "separately charged with three counts of insider trading[.]" DE.286:15. Kazempour drew attention

to this fact during trial, and the jury heard evidence that Kazempour—unlike Pourhassan—had no obligation before trading CytoDyn stock to file a "Form 4," which is an SEC form that a corporate insider must file before selling stocks. DE.286:87-88, 134; DE.292:172-73. Then, in closing, the government again noted several times that only Pourhassan was charged with insider trading. DE.298:106, 155, 161.

When delivering its jury instructions, the court likewise repeatedly admonished the jury that only Pourhassan was charged with insider trading. DE.298:25, 91, 106-10. The court further instructed the jury that it must "consider each count of the indictment and each defendant's involvement in that count separately," that its "verdict … must be based solely upon the evidence about each defendant," and that its "verdict as to any defendant on any count should not control [its] decision as to any other defendant on any other count." DE.298:24-25. And when describing the evidence, the court made clear that the jury should not consider lawyers' statements and arguments as evidence and should consider only the witness testimony and admitted exhibits during its deliberations. DE.298:22.

The court then provided instructions on the elements of the charged crimes. For the wire-fraud counts, the court explained that the jury needed to find that Kazempour transmitted a communication by means of a wire "for the purpose of executing and attempting to execute" a "scheme and artifice" to obtain money by "defraud[ing] investors in CytoDyn" about the "attempted development of leronlimab as a potential treatment for HIV and COVID-19." DE.298:60-70.

For the securities-fraud counts, the court explained that the charges in the indictment centered around two different fraudulent schemes that the defendants allegedly perpetrated: (1) "employ[ing] a device, scheme, or artifice to defraud" by "submitting an incomplete BLA to the FDA to misrepresent to investors that a complete BLA had been submitted"; and (2) "ma[king] or caus[ing] to be made material misstatements or omissions … in CytoDyn's press releases and SEC filings."[6] DE.298:48-53. The court further explained that the fraud charged in Count 3 related to the BLA scheme, while the fraud charged in Counts 1,

[6] The court also explained that Counts 2 through 5 charged Kazempour with securities fraud and aiding and abetting securities fraud, and that he aided and abetted Pourhassan's securities fraud if he "knowingly associated himself in some way" with the fraudulent schemes and took "some act to help make the securities fraud succeed." DE.298:57-59.

4, and 5 related to the misstatements-or-omissions scheme. DE.298:46-48, 88-89. And to find Kazempour guilty of securities fraud based on the misstatements-or-omissions scheme, the court continued, the jury needed to find that he "had a duty to CytoDyn shareholders to disclose material facts" or "correct a material misstatement" that CytoDyn made to the investing public. DE.298:53. The court then explained that the jury could find that he had such a duty if it determined that he "was an officer or director of CytoDyn" or held a "position of trust or confidence" in the company. DE.298:53-54.

When it got to the insider-trading counts, the court reiterated that the indictment only charged Pourhassan with this crime. DE.298:106. The court then explained that insider trading is "a type of securities fraud" but, unlike Counts 1 through 5, the insider-trading counts alleged a fraudulent scheme specific to Pourhassan: that he "executed trades in the securit[ies] of CytoDyn" based on "material nonpublic information obtained from his employer CytoDyn," by virtue of "a relationship that involve[d] trust and confidence." DE.298:106-08. To find that Pourhassan was an "insider," the court continued, the jury needed to find that he "be-

came involved in the conduct of the business of CytoDyn and gained access to material confidential information while acting in that capacity[.]" DE.298:109. The court next explained that, if the jury made those findings, it could also find that he "owed a duty to the corporation and its shareholders not to benefit from the use of the material confidential information." DE.298:109. And if the jury made all those findings, the court explained, it should find Pourhassan guilty of insider trading if it determined that he successfully sold his stock in CytoDyn based on that inside information on three specified dates. DE.298:107.

The court sent the jury to deliberate with a copy of its instructions and two verdict forms: one listing the charges against Kazempour and another listing the charges against Pourhassan. DE.298:20; DE.280; DE.282. The verdict form for Kazempour contained no reference to insider trading. DE.282. The jury deliberated for around six days before returning a split verdict as to both defendants. With respect to Kazempour, the jury found him guilty on Counts 3 and 8 and not guilty on the other counts. DE.282. The jury found Pourhassan guilty on all charges except for the conspiracy charged in Count 1 and the wire-fraud charge in Count 6. DE.280.

### D. Kazempour's Post-Trial Motions

Kazempour moved for a judgment of acquittal or, alternatively, a new trial. DE.311. The court denied his motion for a judgment of acquittal but granted him a new trial based on its concern that "prejudicial spillover" from Pourhassan's insider-trading charges led the jury to "convict[] [Kazempour] on an [uncharged] insider trading theory." DE.374:20-24. The court concluded that the jury was likely confused by the similarities in its instructions on the concept of owing a legal duty to shareholders in the securities-fraud and insider-trading contexts and thus "mistakenly engrafted onto Kazempour the 'insider trading' theory and evidence meant only for Pourhassan." DE.374:23-24. While the court acknowledged that a jury, especially one that issued split verdicts after lengthy deliberations, "is presumed to have followed the Court's instruction and delivered a constitutionally sound verdict," the court nevertheless took the "extraordinary" step of overturning the verdict based on the asserted "unfairness" caused by: (1) the trial evidence about Kazempour's role at CytoDyn; (2) the similarities between its instructions on securities fraud and insider trading; and (3) the fact that the jury "acquitted [Kazempour] of all other wrongdoing." DE.374:20-24.

The government filed a timely notice of interlocutory appeal of the district court's order granting Kazempour a new trial, and Kazempour filed a notice of conditional cross appeal of the denial of his motion for a judgment of acquittal. DE.392; DE.393. This Court consolidated the two cases as cross-appeals.[7]

## III. Ruling Under Review

The government appeals the district court's memorandum opinion and order vacating Kazempour's convictions and granting him a new trial. DE.374; DE.375.

## SUMMARY OF ARGUMENT

The district court abused its discretion by granting Kazempour a new trial based on its assumption that evidence of Pourhassan's insider trading prevented the jury from rendering a fair verdict. New trials should be ordered sparingly, and nothing about the circumstances of this case supports that extraordinary relief. To start, the record confirms that the jury was not prejudicially confused by hearing evidence of Pourhassan's insider-trading charges. The evidence supporting those

[7] Pourhassan appealed his judgment of conviction, but his case was not consolidated with Kazempour's. *See United States v. Pourhassan*, Case No. 26-4062 (4th Cir.).

charges substantially overlapped with the admissible evidence against Kazempour, and the evidence supporting Kazempour's convictions was independently strong. Moreover, the court's jury instructions effectively mitigated any risk that spillover prejudice infected the jury's deliberations, and the jury's split verdicts support the virtually irrebuttable presumption that the jury followed those instructions.

In fact, the court's ruling, which rested almost entirely on its speculation that the jury either disregarded or misunderstood its instructions, gave insufficient deference to that foundational legal principle. The court's decision whether to grant a new trial was necessarily constrained by this rule, and its reasons for deviating from it were both insufficient and inconsistent with the record. This Court should reverse the order granting a new trial and order the district court to reinstate the jury's guilty verdicts against Kazempour.

## ARGUMENT

## The District Court Erred In Granting a New Trial.

### A. Standard of Review

Under Rule 33(a) of the Federal Rules of Criminal Procedure, a court may "grant" a defendant's motion for a new trial "if the interest of justice so requires." This Court reviews the decision whether to grant a

new trial due to the asserted effects of spillover prejudice for abuse of discretion. *United States v. Head*, 77 F.3d 472 (Tbl.), 1996 WL 60445, at *2 (4th Cir. Feb. 12, 1996) (per curiam) (unpublished); *see also United States v. Correia*, 55 F.4th 12, 36 (1st Cir. 2022). While this "standard accords deference to the district courts, it does not insulate them from review[.]" *United States v. Rafiekian*, 991 F.3d 529, 549 (4th Cir. 2021) (quotation marks omitted). Indeed, "the standard for jettisoning a jury verdict in favor of a new trial remains demanding, and courts must exercise their discretion to do so sparingly." *Id.* (quotation marks omitted). A district court abuses that discretion when it "acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion, relies on faulty legal or factual premises, or reaches a decision outside the bounds of reasonable disagreement." *United States v. Fulton*, 136 F.4th 185, 191 (4th Cir. 2025) (quotation marks omitted). A district court likewise abuses its discretion when its judgment is "so fundamentally wrong" that it is "unsupportable rather than merely mistaken[.]" *Id.* (quotation marks omitted).

### B. The Jury's Verdict Was Not Tainted by Impermissible Spillover Evidence.

The district court granted a new trial based on concerns that evidence of Pourhassan's insider trading had a prejudicial spillover effect on Kazempour. Claims of prejudicial spillover typically arise in two contexts: when evidence relating to an acquitted or dismissed count had a prejudicial effect on a defendant's count of conviction, or when evidence against one defendant had a prejudicial effect on a co-defendant. *See United States v. Covington*, --- F.4th ---, 2026 WL 1902549, at *11 (4th Cir. July 2, 2026) (discussing the former); *United States v. Campbell*, 963 F.3d 309, 318-19 (4th Cir. 2020) (discussing the latter). Both claims call for an inquiry into whether the spillover evidence prevented the jury from rendering a fair verdict.

To obtain a new trial in the first context, a defendant must show "(1) 'that the challenged evidence would have been inadmissible at trial without the vacated count,' and (2) that the challenged evidence 'prejudiced his convictions on the remaining counts.'" *United States v. Banks*, 104 F.4th 496, 520 (4th Cir. 2024) (quoting *United States v. Hart*, 91 F.4th 732, 741 (4th Cir. 2024)). And in the second context, it is not enough that "the evidence against" one defendant "is stronger or more

inflammatory than the evidence against" another; rather, the spillover evidence must be so prejudicial that it "'prevent[ed] the jury from making a reliable judgment about guilt or innocence.'"[8] *Campbell*, 963 F.3d at 318.

Under either standard, no prejudicial spillover occurred. As explained below, the evidence of Pourhassan's insider trading substantially overlapped with the admissible evidence against Kazempour, and the evidence supporting Kazempour's guilty verdicts was otherwise strong. Moreover, according to this Court's precedent, the district court's jury instructions mitigated any risk of spillover prejudice, and the jury's split verdict as to each defendant confirms that the jury carefully heeded the court's admonishment to consider the charges and the defendants separately. In concluding otherwise, the district court did not rely on any of

[8] The government has been unable to locate any precedent from this Court addressing the scenario here, where a district court denied a defendant's motion to sever but later granted the defendant's motion for a new trial based on a claim that he was prejudiced by a joint trial. Accordingly, the government is relying on the standard set forth by this Court when reviewing the denial of a motion to sever, which is generally analogous to the two-part framework this Court uses when determining whether prejudicial spillover involving an acquitted or dismissed count warrants a new trial. Other circuits have applied a similar spillover analysis when reviewing new-trial claims in this context. *See, e.g.*, *Correia*, 55 F.4th at 36-37.

this Court's legal guardrails to guide its analysis and arrived at an outcome that finds no support in the record. The district court therefore abused its discretion.

1. Kazempour could not have been prejudiced by a joint trial with Pourhassan because the evidence supporting Pourhassan's insider-trading charges would have been largely—if not entirely—admissible against Kazempour regardless. *See United States v. Devine*, 40 F.4th 139, 149-50 (4th Cir. 2022); *see also United States v. Cole*, 857 F.2d 971, 974 (4th Cir. 1988) ("[T]he fact that much of [the challenged evidence] could have been properly introduced greatly mitigates any prejudice to the defendants that results from the joinder."). As an initial matter, the evidence would have been admissible against Kazempour to prove the conspiracy charge. After all, "a conspirator is liable for all acts … in furtherance of the conspiracy," which is precisely why this Court "'adhere[s] to the rule that defendants charged with participation in the same conspiracy are to be tried jointly.'" *Campbell*, 963 F.3d at 318. And here, the conspiracy count alleged that, after Kazempour filed the incomplete BLA, Pourhassan engaged in insider trading as part of an overt act in furtherance of the conspiracy. DE.185:21-24. Evidence that Pourhassan

engaged in insider trading therefore would have been admissible against Kazempour even if he had been tried separately. *See United States v. Janati*, 374 F.3d 263, 270 (4th Cir. 2004) ("It is well established that when seeking to prove a conspiracy, the government is permitted to present evidence of acts committed in furtherance of the conspiracy … .").

Setting aside the conspiracy charge, the prejudicial effect of the insider-trading evidence on Kazempour was necessarily minimal. To start, the additional evidence supporting the insider-trading charges was limited. It consisted of, *inter alia*, testimony about Pourhassan's stock trades after he falsely announced that Kazempour submitted a complete BLA and witness testimony about what constitutes insider trading. *See* DE.374:21 (citing testimony). Such evidence can hardly be considered so inflammatory as to warrant a new trial on spillover-prejudice grounds. *See United States v. Hall*, 93 F.3d 126, 131-32 (4th Cir. 1996) (rejecting spillover claim that co-defendant's murder charge may have inflamed the passions of the jury), *abrogated on other grounds by Richardson v. United States*, 526 U.S. 813 (1999); *United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012) (rejecting spillover claim where defendants "were forced

to defend themselves against … murders not attributable to all defendants”). Moreover, the underlying facts supporting the insider-trading charges significantly overlapped with the facts supporting Kazempour’s charges, meaning that the government’s trial presentation would have proceeded in largely the same manner regardless of whether the defendants were tried jointly.

At most, the additional testimony about Pourhassan’s insider trading may have suggested to the jury that there was a disparity in the amount of evidence against Pourhassan and Kazempour. But that is an insufficient reason to grant Kazempour a new trial based on spillover-prejudice grounds. *See United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999).

2. The strength of the government’s evidence supporting Kazempour’s guilty verdicts on Counts 3 and 8 further mitigated any risk of spillover prejudice from Pourhassan’s insider-trading charges. *See Covington*, 2026 WL 1902549, at *11 (rejecting spillover claim based in part on the strength of the evidence supporting the other count). As the district court explained in denying Kazempour a judgment of acquittal, the evidence plainly supported the jury’s guilty verdicts on these counts.

DE.374:13-15. And that evidence was clear and straight-forward. The jury saw the email in which Pourhassan instructed Kazempour to submit the BLA even if it was "short" to boost CytoDyn's stock price, GX.2; heard testimony that this email constituted an instruction for Kazempour to file an incomplete BLA, DE.290:245-46; and saw a second email in which Kazempour admitted that he expressed concerns about this plan to Pourhassan, DE.289:25. The jury also heard that Kazempour nevertheless filed the incomplete BLA, which allowed Pourhassan to mislead investors into thinking that CytoDyn was steps away from licensing a treatment for HIV. DE.287:29-31. Finally, the jury heard that Kazempour sent an email to CytoDyn's CFO and Pourhassan asking for help selling his shares in CytoDyn stock the very next day. DE.292:105-06.

As the government argued in closing, submitting an incomplete BLA in order to misrepresent to investors that a complete BLA had been filed constituted securities fraud; Kazempour "aid[ed] and abet[ed] … th[is] securities fraud" by "following the order" to submit the incomplete BLA; and Kazempour then committed wire fraud by sending an email in an attempt "to obtain money as part of the scheme that he's engaged in." DE.298:145-46, 150-51. Given the strength of the evidence, the limited

additional testimony about Pourhassan's insider trading could not have prejudicially influenced the jury's verdicts on Counts 3 and 8.

3. In any event, the district court's jury instructions cured any risk of spillover prejudice. The court specifically admonished the jury that it must "consider each count of the indictment and each defendant's involvement in that count separately"; that it must render its verdict "based solely upon the evidence about each defendant"; and that its "verdict as to any defendant on any count should not control [its] decision as to any other defendant on any other count." DE.298:24-25. Supreme Court guidance requires courts to presume "'that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.'" *United States v. Olano*, 507 U.S. 725, 740 (1993) (quoting *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985)). Indeed, "[o]ur theory of trial relies upon the ability of a jury to follow instructions." *Opper v. United States*, 348 U.S. 84, 95 (1954). Accordingly, this Court has repeatedly recognized that instructions like the one the district court gave here—to weigh the evidence carefully and

consider the charges and the defendants separately—"are generally sufficient to address any spillover risk." *Devine*, 40 F.4th at 150; *see also United States v. Bullock*, 203 F.3d 823 (Tbl.), 2000 WL 84449, at *7 (4th Cir. Jan. 27, 2000) (per curiam) (unpublished) ("This type of instruction … would have cured any risk of prejudice.").

What is more, the verdicts here indicate that the jury heeded the court's cautionary instruction on how to weigh the different categories of evidence against Kazempour and Pourhassan. After deliberating for nearly a week, the jury returned split verdicts as to each defendant, and the split verdicts themselves show that the jury weighed the charges and the defendants individually. As this Court has repeatedly explained, these sort of verdicts "confirm[] [that] the jury took the court's instruction [to 'give separate and individual consideration to each charge against each Defendant'] seriously." *Covington*, 2026 WL 1902549, at *11; *United States v. Lester*, 816 F. App'x 780, 791-92 (4th Cir. 2020) (per curiam) (explaining that a split verdict "resolved" any concerns about prejudicial spillover); *Bullock*, 2000 WL 84449, at *7 ("[T]he jury's [split] verdicts demonstrate that it carefully 'sifted' through the evidence and followed the district court's instructions."); *see also United States v. Hill*, 643 F.3d

807, 829 (11th Cir. 2011) ("After deliberating for eight days, the jury acquitted Rector of 25 of the 121 charges against him, a result that demonstrates the care with which the jury sifted through the evidence and considered the charges.").

The district court, however, gave little weight to this authority. In fact, the court took the exact opposite approach, inferring from the jury's not-guilty verdicts against Kazempour that the jury must have "mistakenly" found him guilty on Counts 3 and 8 based on a theory of insider-trading liability that only applied to Pourhassan. DE.374:24. That inference conflicts with this Court's long-standing precedent and, as explained in more detail below, improperly intruded into the province of the jury by assuming that it disregarded its oath and misunderstood the court's instructions.

Seeking to justify this improper inference, the district court faulted the government for introducing evidence and argument at trial about Kazempour's "insider"-like role at CytoDyn and his attempt to profit off the charged fraud. DE.374:21-22. But the government's trial presentation was entirely appropriate. As the court recognized before trial, evi-

dence about Kazempour's integral role at CytoDyn was relevant and admissible as part of the facts constituting the overarching conspiracy. DE.197:210-11. Indeed, the government briefly referred to Kazempour as an "insider" in its opening statement while summarizing a reasonable and relevant claim: Kazempour worked closely with Pourhassan and thus was part of the conspiracy to defraud CytoDyn's investors. DE.286:15-19. Evidence that Kazempour inquired about selling his stock after he submitted the incomplete BLA and argument that he did so for his own financial benefit was likewise appropriate, both to support the government's theory that he conspired with Pourhassan to "enrich" himself and to establish a financial motive for his wire-fraud charge in Count 8. DE.185:9; DE.298:60-70 (jury instructions on wire fraud).

Moreover, the court's hand-picked examples of purportedly confusing evidence and arguments cannot overcome the other instances in the record where the jury was definitively informed that Kazempour was not charged with insider trading. As noted above, the parties and the court emphasized throughout trial that only Pourhassan was charged with that offense. And, if anything, that Kazempour was not charged with insider trading while Pourhassan was—and that the jury was repeatedly

reminded of this fact—almost certainly led the jury to conclude that the government did not think Kazempour engaged in insider trading. In addition, the jury heard testimony that Kazempour, unlike Pourhassan, did not need to file the mandatory SEC corporate-insider form before trading in CytoDyn stock. DE.286:87-88, 134; DE.292:172-73. The court's assumption that the jury must have ignored its instructions and this other evidence and instead relied on an improper theory of guilt in returning its verdicts is precisely the type of "unfounded speculation" about jury deliberations that the Supreme Court has long cautioned against. *Opper*, 348 U.S. at 95 ("To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict.").

* * *

In sum, there was nothing so "exceptional" about this case to justify overturning the jury's verdict and requiring the government to try Kazempour separately and for a second time. *United States v. Oloyede*, 933 F.3d 302, 312 (4th Cir. 2019). The district court, for its part, did not cite this Court's precedent on spillover prejudice or question the suffi-

ciency of the evidence supporting Kazempour's guilty verdicts when ordering a new trial. DE.374:20-24. Nor did it cite much evidence related to Pourhassan's insider-trading charges that it believed deprived Kazempour of a fair trial. In fact, aside from quoting a snippet of testimony from a government witness about insider trading, the court focused its analysis entirely on the government's evidence and arguments about Kazempour. DE.374:20-22. While a court's decision to grant a new trial is owed deference, it must be grounded in the law and supported by the evidence. *See United States v. Millender*, 970 F.3d 523, 531-32 (4th Cir. 2020) (finding abuse of discretion where court "'mentioned' the demanding standard for granting a new trial 'in passing,'" but did not "appreciate[] the limits on its discretion"). The court's decision to grant Kazempour a new trial based on the asserted effects of prejudicial spillover from Pourhassan's insider-trading charges was neither. This Court should reverse.

### C. The District Court Abused Its Discretion by Disregarding the Core Tenet that Juries Follow Instructions.

The district court's animating "concern[]" when considering Kazempour's request for a new trial was whether the jury was able to apprehend

and follow its instructions. DE.374:24.[9] After reviewing a handful of excerpts from opening statements, closing arguments, and trial testimony, the court concluded that "significant confusion" likely led the jury to misapply its instructions and find Kazempour guilty of securities fraud and wire fraud based on an insider-trading theory that only applied to Pourhassan. DE.374:23. In reaching that conclusion, the court gave "insufficient deference to the 'almost invariable assumption of the law'" that a jury can understand and abide by its instructions. *Rafiekian*, 991 F.3d at 551.

Courts must "adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions." *Francis*, 471 U.S. at 324 n.9. The Supreme Court has endorsed this presumption in a wide variety of contexts. *See Samia v. United States*, 599 U.S. 635, 646-47 (2023) (citing examples). Indeed, "juries are presumed to follow the court's instructions" in "sensitive" and "life-and-

---

[9] *See also* DE.374:20 ("[T]he jury likely convicted him on an insider trading theory, even though he had not been charged with insider trading."); DE.374:23 ("[T]he Court cannot ignore how that choice likely led to significant confusion as to the basis on which Kazempour was convicted."); DE.374:23 ("[T]he susceptibility for confusion is best captured by comparing insider trading instructions pertinent only for Pourhassan, and the securities fraud instructions for Kazempour.").

death matters," *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) (per curiam), and in cases involving complex issues that one may think a jury is "'too ignorant to comprehend,'" *Samia*, 599 U.S. at 647 (quoting *Pennsylvania Co. v. Roy*, 102 U.S. 451, 459 (1880)). The only exceptions to this rule are "narrow" ones involving evidence so vividly and directly inculpatory that it creates an "overwhelming probability" that the jury will not follow its instructions. *Richardson v. Marsh*, 481 U.S. 200, 207-08 (1987); *see also Rafiekian*, 991 F.3d at 550 ("But save for *extraordinary* situations, we adhere to the crucial assumption … that jurors carefully follow instructions." (quotation marks omitted)).

The district court identified no such exception here. To be sure, the court acknowledged the "fundamental principle[]" that a jury "is presumed to have followed the Court's instruction," but it contended that this principle "d[id] not eclipse the unfairness in allowing Kazempour's verdict to stand." DE.374:24. As explained above, however, the record is replete with evidence that, according to this Court's precedent, would have mitigated any risk of spillover prejudice. The court overlooked this evidence and assumed instead that the nature of the charges, coupled with the similarity in its jury instructions on securities fraud and insider

trading, left the jury so confused that it was unable to follow those instructions. This type of guesswork about whether the jury honored its oath and followed its instructions is inconsistent with established Supreme Court precedent. *Opper*, 348 U.S. at 94-95. Because the court's decision was "necessarily constrained" by the virtually unshakeable presumption that the jury followed its instructions, its decision to "depart[] from that bedrock principle" without sufficient explanation was an abuse of discretion. *Rafiekian*, 991 F.3d at 551.

To make matters worse, the district court departed from this foundational legal principle several times over. In speculating that the jury could not "compartmentalize[] the strong evidence supporting the insider trading conviction of Pourhassan separate from Kazempour," DE.374:24, the court assumed that the jury ignored its instruction to "consider each count of the indictment and each defendant's involvement in that count separately," DE.298:24-25. In hypothesizing that the jury improperly weighed what government counsel said about Kazempour's role at CytoDyn in opening statements and closing arguments, DE.374:20-22, the court assumed that the jury disregarded its instructions that such statements do not constitute evidence for the jury to consider, DE.298:22. And

in suggesting that "the jury mistakenly engrafted onto Kazempour the 'insider trading' theory and evidence meant only for Pourhassan," DE.374:24, the court assumed that the jury fundamentally misunderstood and thus misapplied the entirety of its instructions on the law.[10]

This final assumption warrants special attention. Even if such speculation about the jury's deliberations provided an appropriate basis to toss out the jury's verdicts, the district court's explanation as to how the jury likely misunderstood its instructions cannot be squared with the record. The thrust of the court's concern was that the theory of securities fraud charged in Counts 1, 4, and 5—that Kazempour owed a duty to CytoDyn's shareholders to correct false or misleading information in the company's public statements—caused the jury to conflate his securities-fraud charges with Pourhassan's insider-trading charges. In particular, the court reasoned that the jury must have been confused by the similarities between (1) its insider-trading instructions on how to determine whether Pourhassan owed a duty to CytoDyn's shareholders to not trade

[10] That assumption was particularly unfounded here, where the jury was given one verdict form that listed the charges against Kazempour (which did not include insider trading) and another verdict form that listed the charges against Pourhassan (which included insider trading). *See* DE.280; DE.282.

stocks based on inside information and (2) its securities-fraud instructions on how to determine whether Kazempour owed a duty to shareholders to correct or disclose material facts after making material misstatements or omissions in CytoDyn's public statements. DE.374:23-24. Because of this potentially "significant confusion," the court concluded, the jury must have mistakenly relied on an insider-trading theory when finding Kazempour guilty on Counts 3 and 8. DE.374:23-24.

Setting aside that the jury instructions made clear that Pourhassan alone was charged with insider trading, the court overstated the similarities between these instructions. While the court used similar language to explain when a defendant owes a duty to a company's shareholders in the securities-fraud and insider-trading contexts, the court went to great lengths to differentiate the indictment's allegations as to those charges. When instructing the jury on securities fraud, the court explained that the securities-fraud counts charged two discrete frauds for the jury to consider: (1) "the defendants employed a device, scheme, or artifice to defraud," by "submitting an incomplete BLA to the FDA to misrepresent to investors that a complete BLA had been submitted"; and (2) "the defend-

ants made or caused to be made a materially false misstatement or omission" in violation of their "duty to disclose the [material] fact." DE.298:50-53. Then, when instructing the jury on insider trading, the court explained that the government charged a third theory of fraud that applied only to Pourhassan: he "executed trades in the securit[ies] of CytoDyn" "on the basis of material nonpublic information obtained from his employer[.]" DE.298:107.

Moreover, the court's assumption that the jury conflated the instructions on these two offenses is undermined by the jury's own verdict. The jury was presented with three securities-fraud counts involving a claim that Kazempour made material misstatements or omissions that he owed a duty to CytoDyn's shareholders to correct: Count 1, which charged him with conspiring to commit securities fraud by, *inter alia*, failing to correct "false and misleading representations" in CytoDyn's press releases; and Counts 4 and 5, which charged him with causing CytoDyn to include "materially false and misleading" statements in its SEC filings. DE.185:19-22, 25-26, 29, 33. The jury found him not guilty of these three securities-fraud charges and instead found him guilty only on Count 3, which charged that Kazempour aided and abetted Pourhassan's

securities fraud through the employment of a deceptive device by filing the incomplete BLA. In other words, the jury's split verdict indicates that it disagreed with the government's theory that he owed any duty to CytoDyn's shareholders. At a minimum, this verdict does not support the court's speculation that the jury "likely convicted him on" a duty-based theory of insider trading. DE.374:20. Granting a new trial based on such speculation about the jury's deliberative process, unmoored from the record and the jury's actual verdicts, was error.

### D. At a Minimum, This Court Should Reverse the District Court's Grant of a New Trial on the Wire-Fraud Count.

Finally, to the extent this Court determines that the district court did not abuse its discretion in assuming that the jury "mistakenly engrafted onto Kazempour the 'insider trading' theory and evidence meant only for Pourhassan," DE.374:24, this Court should nevertheless reverse the court's grant of a new trial as to Count 8.

The district court granted Kazempour a new trial because it was "deeply concerned" that the jury "likely convicted him on an insider trading theory, even though he had not been charged with insider trading." DE.374:20-24. In support of that belief, the court noted that "[i]nsider trading is a form of securities fraud"; that the government referred to

Kazempour as an "insider" at trial; that the government "pursue[d] a similar 'insider' theory of liability against Kazempour" on some securities-fraud charges; and that the jury instructions on securities fraud and insider trading contained similar language. DE.374:20-24. In other words, the court focused its decision on concerns over the fairness of the jury's verdict as to the securities-fraud charge in Count 3 but provided little to no explanation as to how those concerns bled into the jury's verdict on the wire-fraud charge in Count 8.

Indeed, the court's instructions on wire fraud bore little resemblance to its instructions on insider trading. They did not, for example, require that the jury make any finding about Kazempour's "insider" status at CytoDyn in order to find him guilty of wire fraud. And, as the court concluded when denying Kazempour's motion for a judgment of acquittal, the evidence supporting his wire-fraud conviction was clear: "a reasonable juror could conclude that Kazempour's attempted exercise of the warrants the … day [after Pourhassan falsely announced that he filed a complete BLA] was for his own financial benefit, and thus reflected fraudulent intent to profit from an artificially inflated stock price." DE.374:14-

15. Whether the jury was confused by similarities between the instructions on securities fraud and insider trading thus had no bearing on the jury's verdict on Count 8. But the court did not grapple with these distinctions before ordering a new trial. That failure constitutes an abuse of discretion. *Cf. Millender*, 970 F.3d at 531 (declining to affirm a conditional new-trial grant where court's reasoning was "sparse"); *Fulton*, 136 F.4th at 192 (finding abuse of discretion in conditional grant of a new trial where "the court did not assess the evidence as a whole").

Nor does the record allow this Court to fill the gaps in the district court's reasoning. Affirming the court's grant of a new trial on Count 8 would require this Court to string together a chain of implausible hypotheticals. First, this Court would need to assume that the jury disregarded the instructions to consider the defendants and the charges separately. The Court would next need to assume that the jury did not understand the distinction between the insider-trading instructions, which applied only to Pourhassan, and the securities-fraud instructions, which applied to both defendants. The Court would further have to assume that the jury conflated Kazempour's securities-fraud charges with his wire-fraud charges, even though the instructions for those charges bore no

meaningful similarities. Finally, the Court would have to assume that the jury never sought to clarify these issues, paid no attention to the separate verdict forms during deliberations, and then opted to misapply the instructions on Pourhassan's insider-trading charges to Kazempour's wire-fraud charge.

While this Court's review is deferential, it is not fantastical: the district court's determinations must be supported by facts in (and reasoning on) the record and cannot be back-filled through a daisy-chain of speculative inferences. *Cf. Millender*, 970 F.3d at 531 (vacating conditional grant of a new trial based on court's "sparse" reasoning that lacked "an actual explanation" (quotation marks omitted)). That is particularly so here, where the jury's split verdicts following its lengthy deliberations indicate that those inferences are unfounded. This Court should, at a minimum, reverse the grant of a new trial and order that the district court reinstate the jury's guilty verdict as to the wire-fraud charge in Count 8.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court reverse the district court's order granting a new trial and order the court to reinstate Kazempour's convictions.

Respectfully submitted,

/s/ William G. Clayman


KELLY O. HAYES
*United States Attorney*

DAVID C. BORNSTEIN
*Chief, Appellate Division*
*District of Maryland*

JEREMY R. SANDERS
*Appellate Counsel*

MATTHEW REILLY
VASANTH R. SRIDHARAN
*Trial Attorneys*
*Fraud Section*

A. TYSEN DUVA
*Assistant Attorney General*

JOSH A. GOLDFOOT
*Deputy Assistant Attorney General*

WILLIAM G. CLAYMAN
*Attorney, Appellate Section*
*Criminal Division*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C. 20530*
*(202) 514-0040*
*William.Clayman@usdoj.gov*


July 15, 2026

## STATEMENT REGARDING ORAL ARGUMENT

The United States respectfully requests that the Court hold oral argument. Given the voluminous trial record and the complexity of the factual background, the United States believes that oral argument will assist the Court in resolving the case.

## CERTIFICATE OF COMPLIANCE

**1.** This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,315 countable words, as verified by the word-count feature of Microsoft Word for Office 365.

**2.** This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6) because it has been prepared in proportionally spaced, 14-point Century Schoolbook font.

Dated: July 15, 2026

/s/William G. Clayman
WILLIAM G. CLAYMAN
*Attorney, Appellate Section*
*Criminal Division*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C. 20530*
*(202) 514-0040*
*William.Clayman@usdoj.gov*

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the Fourth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/William G. Clayman
WILLIAM G. CLAYMAN
*Attorney, Appellate Section*
*Criminal Division*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C. 20530*
*(202) 514-0040*
*William.Clayman@usdoj.gov*